2014-1185, Vascular Solutions v. Boston Scientific, Mr. Wolfe. So the panel is somewhat confused about how the invention works. And so you don't have to worry about your time. We want to spend a bit here at the beginning getting from both counsel the equivalent of a technical tutorial, what you would normally give to a district court judge or a jury, because we're sort of struggling to understand how the technology works. The patent doesn't always correlate items in the figures with the numbers in the spec and how the accused device actually works. So rather than try to jump into your claim construction arguments, would you mind stepping back and giving us the equivalent of a technical tutorial? Is that something that you're OK doing this morning? Absolutely, Your Honor. May I please? Let me sharpen it from my personal viewpoint, which is, if I'm a cardiologist and I've got a patient in front of me who I'm about to use either one of these devices, what goes in first? What goes in second? What am I doing? What's the push-frod push? We can't figure out all these things. Understood, Your Honor. So let's start with, and may it please the court, Matthew Wolfe for Boston Scientific. Let's start with a guide catheter. No, I'd start with a guide wire. Does that come first? There's a lot of stuff in here, particularly in the patent, about guide wires. What is a guide wire? Is it like a telephone cable? What is it? A guide wire is literally a wire, a long wire, with a pigtail at the end that can be various shapes. And if you imagine, it's relatively stiff, but also flexible, and it has a little twist knob at the end. Does it go in first? Usually, the guide wire and guide catheter end up together in there. Usually, the guide wire goes in and the guide catheter goes over it. There can be exceptions. Now, when you say the guide catheter goes over it, that was one of the questions. All the way through, you gentlemen in your briefs talk about the guide catheter goes over the wire. Does that mean it's got little rollers that it rolls on over the wire? Or if the wire is above it and it goes under it, then it goes under the wire? What is the relationship between the guide wire and the guide catheter? So just imagine, the guide catheter is nothing more than a very small garden hose. The guide wire is exactly what it sounds like. It's a relatively stiff wire. The cardiologist, usually through the femoral artery, runs the guide wire through the vasculature. What's on the end of it? Anything? On the end of the guide wire? Is it literally just a wire, or does it have some sort of sinker or something on the end of it? On the distal end, the part away from the doctor, that's where that pigtail goes. OK. OK. At the proximal end, there's usually a little handle. And you're not allowed to laugh when I ask you the question. So the guide wire is run through the femoral artery, and this is very cool to watch on fluoroscopy, up through the vasculature and across the lesion you're trying to target. Was there a movie or a technical tutorial presented below that possibly we could have you give to us, only if it was part of the record below? There were definitely pictures of it. I don't recall a video. Your Honor, there was no movie, Mr. Root's first declaration starting at A200 in particular. OK, well, no. We'll hear from you later. Go ahead. I don't, there was no movie. So is there a cardiologist in the audience? So the guide wire goes up and across the lesion, the area of stenosis where the blockage of the artery occurs. So it's now a track.  You're going to run everything all along. But it's just a single wire. Think of a stiff human being. Then what happens? Then you take the guide catheter, which is really just a garden hose. There can be bells and whistles. But it runs, and it's got a diameter enough that you can run catheters through it. It runs along the guide wire up to the point layer inside it. So imagine. Wait, hold it. What runs inside what? The guide wire. So this is the guide wire. This is the guide catheter. Pardon me. That's the relationship. Oh, the guide wire is inserted into the guide catheter. No, the guide wire's already in the body. The catheter's inserted over it. Oh, the catheter is inserted in a way so the guide wire ends up in the catheter. Right, so the guide wire's sticking outside the body. And it runs all the way through. They're very long. Not that much. And it's across the lesion. So you now have this wire sticking out there. Here's the guide wire right here, out of the body. And you now take the tube and put it over the end of the guide wire and string it along. So you now have the guide wire inside the guide catheter. Back over here, because we record this. I apologize, Your Honor. I apologize, Your Honor. So you have the guide wire inside the guide catheter. The first time I've understood that part. Go ahead. OK, so then the problem is, in some circumstances, the guide catheter, the diameter of the guide catheter is too big to get to where you want to go. So imagine a small artery, a larger guide catheter, and they butt up against each other. You want that guide catheter to stay in place. Because subsequently, you're going to be putting, for example, a stent delivery system through it. Is that the purpose of the tapered part? Yes, but it still can be too big. And that's where the products at issue in this case come in. The coaxial, what you call a coaxial catheter. That's right. Why is it called a coaxial catheter? So think of a bullseye, one inside the other, a coaxial cable, like your cable television. It just means that they're concentric inside each other. OK, so now you're going to run this coaxial catheter inside the guide catheter. Where is the guide wire at that point? It's like those little Russian dolls that nest inside each other, right? Exactly. And you're going to find the one that has the right thinness to get through the artery. That's exactly right, your honor. So you have this guide catheter that's largely a consistent diameter, and usually does the job, gets to where you want to go. But sometimes you need to go farther. To get into the artery. To get to the lesion you need to get to, to the blockage. And so in 1996, Boston Scientific filed the patent, the Adams patent, for what's called a guide catheter extension. And really what it is is, so a guide catheter is really long. Imagine we chopped off the end of it, made the end a little bit smaller, but much more flexible, two beads, and just stuck a long push rod on it. No, wait, hold it. Stuck a long push rod on what? So this is the garden hose that is the guide catheter. We're going to take another piece of slightly smaller garden hose, maybe 10 inches. And we're going to have a long, maybe 100 centimeter push rod. So we're now. To the bottom of this interior hose. Right, so we're going to now push it along. Is this picture in the reply brief at page four, this is the Boston Scientific device. Is this what you're describing now? Yes, exactly, your honor. Do you have your picture? It might help you to visualize what he said. I do love pictures. But that's not the picture of the atom spasms, right? Correct, your honor. This is the Godzilla. That's correct, your honor. So here you have your push rod. Tell me about the push rod. What does it push? What's it doing? It's pushing that 10 inches of guide catheter through the guide catheter extension, so the blue. So the guide catheter, the long one, looks exactly like the blue to the left of this figure, but it's much, much longer. So we're now going to push this blue inside the guide catheter all the way to the end and past the end. So in theory, this catheter is a narrower diameter, so it's going to slide inside the other catheter. But I still don't get, what is pushing? What's the push rod pushing? It's pushing that last 10 inches. So in order to get to that 10 inches, just imagine at the end of the day. OK, so here's a really stupid question. So is the flexible tip, the part going in first, and the push rod is what the doctor is using to push the whole catheter in? Or is the push rod going in first, and the flexible tip is at the back end? The flexible tip is going first. And so you're pushing that. So imagine at the end of the day, you're pushing it with the push rod. And then do you extract the push rod? No, it's all one piece. It's all of a piece. Well, it'll ultimately be extracted before the surgery is completed. Not too many people walk around with push rods. But the doctor pushes this 10-inch extension all the way in to where he or she wants it, and leaves it in place, that is, in the guide catheter. Actually, now it's in the coaxial catheter. So imagine that a typical procedure might say 5 inches of the 10 inches we see in blue remain in the guide catheter, or at the far end of the guide catheter. The other 5 inches are now beyond. It's like you've added an extension. Where is the coaxial catheter at this point? It's inside as well. Yes. Butted up to the artery, but not being able to get through. So what goes inside this hole, then, in your device? So this is a catheter, right? Right. And it's big enough. So what's going to go into it? Typically, either an angioplasty catheter, or a stent-delivery catheter, or frankly, both. So I have a lead. The lead you're going to leave in the body, ultimately, is going to be fed through this interior catheter, all the way through into the artery, and that's what's going to be left there. Exactly. The stent, or the balloon, whatever the case may be. So basically, we end up with three, more or less, tubes running up in there, the last one having the stent, or whatever it is, on the end of it. And all that's done through a little piece of the body. Yeah, it's all done, typically, through the groin. These are very small hoses. Exactly, Your Honor. Stents are, a grain of rice gives you a rough idea of the size we're talking about. I think we ought to get going, though, on the argument now, if you don't mind. And don't worry, we'll give you extra time at the front end, if you want to devote it exclusively to a technology, especially if you disagree with Mr. Wolf on anything he said. Can I ask a follow-up question? Yes. Thank you. Tapered inner catheter. Do you have a tapered inner catheter that works with your guidezilla? The taper talks about a tapered inner catheter that goes inside of the coaxial guide catheter, which is already inside the guide catheter. There are companies that sell tapered inner catheters. So you have guide catheters, companies sell guide catheters. You could, in theory, use a vascular solutions guide extension with a Boston Scientific guide catheter with a Medtronic stent. So they're each pieces that are different ways to get to the lesion, and then either expand it with a balloon, or prop it open with a stent, or both. So the tapered inner catheter, as I understand Your Honor's question, is not part of this device. It's a device to be used with it. Right. OK. So let's get the time started, and let you go ahead. Thank you very much. This was very helpful. Why don't you launch into your argument. Thank you, Your Honor. In 1996, Boston Scientific filed the Adams patent. It was the seminal guide catheter extension patent. We've read your brief, and we know that part of the history. Go ahead. Adams was not disclosed to the Patent Office. Adams was not considered by the Patent Office. All of the claims at issue, including the dependent claims that are the subject of this appeal, stood rejected in light of a combination primarily of Klein, which had a Skive, and Niazi, which was a guide catheter. These claims were not allowed until the patentee, until VSI, added the phrase rail structure without a lumen to the independent claims. Well, the examiner, technically. Yes, Your Honor. They accepted the examiner. Absolutely, Your Honor. You're correct. In other words, the Patent Office did not view the additional language of claims three and four of the 032 and the other site opening claims as patentable. Well, let's be clear. What he said was he didn't believe, as far as I'm saying he being the examiner, he didn't believe that non-tubular, non-circular, non-extendable were fully supported by the spec. He wasn't sure about that language. So he proposed what appeared to me to be alternative language, which would maybe embody the same concept, but would arguably be supported by the spec. It wasn't that addition was not made in response to an obvious misrejection or anticipation. Understood, Your Honor. But understand that claims three and four were not deemed patentable. At any time, so remember that what you're talking about, that discourse on non-circular and like that was a very long prosecution. That was in the middle. At the beginning, there was an obvious misrejection in light of Niazi, Klein, and others. Claims three and four, there was not an argument that this site opening, these skies, added anything patentable. The Patent Office certainly didn't accept that argument. That the site opening claims were not allowed until the independent claim was modified. And the modification was? The site opening, or the rail structure without aluminum. What is the rail structure with or without aluminum? What part of that thing you described to us earlier? Where in all of those tubes is this thing called a rail structure? That's a subject of a 112th issue  If you go back to the figure, Your Honor, Figure four of the reply brief. If you don't mind, if you would instead start with the patent, I'd appreciate it. There are only four uses of the word rail in the patent. One associated with figure 17, I completely do not understand what the rail is in figure 17, and nor is anything about figure 17 convinced me of what it is. And then there are four other uses, two of which are claims, and then one of which is where it says the present invention is. And it says, the present invention is a coaxial guide catheter that is deliverable through a standard guide catheter by utilizing a guide wire rail segment to permit delivery without blocking the guide catheter. So that was, it's almost like a functional description of the rail segment. So for me, I'm struggling both in the patent and in Boston Scientific to figure out what I ought to identify as the rail structure. Your Honor, you raise an excellent question. Below, and your question is awkward because of the procedural posture we come to the court in. Below, we have raised, subsequent to the preliminary injunction proceeding, because obviously that was short, we have raised a section 112 issue. We don't know what the rail is, and we intend to move for summary judgment at the appropriate time that there is a failure of written description and likely a failure of enablement. For purposes of this appeal, what we know is what BSI alleges, which is that the substantially rigid section looking at figure four, and the analog figure four of what? I'm sorry, page four of the reply brief, the one we were focusing on just to put the center. Page four. Page four, thank you, Your Honor. Is what they call the collar. Are you Boston Scientific, or are you in figure four in the patent? I'm in the reply brief. Page four of the reply brief. So you're not on the patent, you're now moving to the Boston Scientific, right? I'm happy to go to the patent as well. Your Honor, if you look at, there's frankly not a good picture of what we would call, or what they've called the rail. Maybe we should leave it to Mr. Vick to describe what they claim the rail is, but yes. We'll put the same question to him. What do you think the rail structure is? And your answer is, you don't have an idea. Based on what they've alleged, and they said at deposition in the preliminary injunction, it's the pushrod plus what they call the collar, the stiff portion. So it's everything to the right of when the cube is rubbery. It's the stiff portion. And hence, our first not a pushrod. I understand why you want it to be, because it arguably has a lumen. But why would a pushrod be part of what someone would call the rail structure? Let's assume for the moment that I don't agree with your argument that substantially rigid portion is coextensive with rail structure. Assume I don't agree with that. So now, why is the pushrod part of the rail structure? Because it doesn't guide the guidewire, like the function says. The pushrod, isn't it irrelevant to that guidewire? You're right. I am sort of trying to figure out, for me, what in the Boston Scientific Device would be a rail structure. Your Honor, you're absolutely right. And this is the 112 issue we've raised and are vigorously asserting subsequent to the preliminary injunction hearing. I was going to say, why wasn't this part of your PI? I mean, maybe that would have won the case for you. Well, Your Honor, the problem is, as we said in our brief, they came forward with claim one. That was the entire subject of the brief. There were appendices that referenced other claims. But everything in the brief said, let's look at claim one. Our own patent, as the district court said, anticipated claim one. We thought this case was over with Adam's patent. Let's not talk about your patent. Let's keep going. Would you take a step back? Forget what they allege. Would you typically say a pushrod is a portion of the rail structure? I mean, last night I did what judges are never supposed to do. I sat on Google Patents and looked at every use of the word rail in every catheter patent I could see on the entire patent database. And so, I mean, I gained what I thought might be a sense of what a rail is. I actually found that it could be many different things, quite frankly. But what I never saw, ever, was the idea that a pushrod is part of a rail structure. And so, I know, that's extrinsic evidence. It's not part of this record. I get that. But I think that you can see we're struggling with the technology. Understood. And, Your Honor, I don't know what else to say, except we agree with you. Do you agree with me that a pushrod would not typically be part of what someone would refer to as a rail structure? And we're in the process of telling the district court that rail structure is unsupported. And we need to know what it means. We think the patent's invalid because it's unsupported. Well, Mr. Wolfe, let me ask you this. Your Godzilla, the pushrod, is it some round cylindrical bar? Or is it some flat piece of metal? Or is it kind of grooved, sort of like it has a track? It is this. It is a tube. Except it's closed. It's sealed, right? So for 95 centimeters, it is this. OK. I'm just trying to understand, is there any part of your pushrod that has something that could be regarded as a track? I don't believe so, Your Honor. Because the whole thing is basically like a tube from beginning to end? Yes. So it's a tube for 95 centimeters. At the proximal two centimeters, remember I said there's a little handle, a little twisty thing? That screws in here. It's just a tab so that the doctor can turn it this way. So that screws into the end. And then the two centimeters on this end, it's crimped as part of the welding process. His pushrod, and the pushrod presumably in the patent, is a solid metal tube, a solid metal wire. Yeah, not a tube. Not a tube. It's a wire. You could have used a solid metal wire, but you used a tube closed at both ends, which functions like a wire. Now, why did you do that? Did you do that because you thought you could get around the patent at that point? It does get around the patent, but that's not why we did it. So there are three things when you're using a pushrod that you care about. One is height. You want it to be as narrow as possible so it doesn't obstruct anything. The second is what they call pushability, the ability to imagine pushing a piece of wet spaghetti. You want it to be able to push this way. And the third is flexibility. This structure is easier to push than this structure as a matter of mechanical engineering. More stability. Exactly. Virtue of being in an outer shell. So in the marketing materials shown to the district court, we advertised to the world that we're more pushable because we have aluminum, the hypo tube. They advertised to the world that they're less obstructive. They're flatter. They're two different products with two different characteristics. We think doctors prefer pushability, but that's what makes the horse race. But that's why we did the tube. Now, I have a stupid question. You said in their patent, their pushrod is a wire. I tell you, I read this whole spec. I couldn't find a pushrod in their patent. And so I actually thought maybe it was element 40, which is supposed to be off of the arcuate thing and never shown in any figure. But I couldn't figure it out. They call that the second circumferential portion or something. Where do you find a pushrod in this patent, or where do you get the idea that it's a wire? Well, like in figure 17, you look at 112 maybe. But again, 17. Where is your idea that a pushrod is a wire in that figure? Just a visual. This is another question I'd throw to Mr. Vick because we are similarly confounded. But I thought maybe you knew something that I didn't. Because you said their pushrod, and I assume you meant their patent. No, I'm sorry, Your Honor. You're talking about their acute device used as a guide wire. OK, but don't look at their acute device. Although they've asserted that it's so extensive with the patent claim. So it's in some sense irrelevant, in some sense. But a wire isn't substantially rigid. It's not a substantially rigid portion of the device. So if their wire is their pushrod, then it's not part of the substantially rigid portion as they've claimed it, right? They claim that their wire is substantially rigid. Our wire, our pushrod, is roughly of the same rigidity, but much more pushable, as their wire. They claim it is substantially rigid. Your Honor, I have just about 30 seconds before I'm in rebuttal time. I wanted to emphasize. I don't think you have to worry about your time. You've got time, go ahead. I wanted to emphasize something about, so the patent office said there's nothing about a skived opening that renders this patentable. Where did they say that? Well, Klein, they found that Klein disclosed the elements of three and four. And there was never a point where that was overcome. So the Klein reference was found to, in combination with Niazi, render claims three and four. I'm using that 032 patent as an example. You're now talking about the patent office, initially. Right. So now we go to the district court. Yes. And we argue. What did the district court say about Klein? The district court didn't say anything about Klein. So Klein is not before us. Your Honor, the waiver issue is a big red herring here. But we argued extensively at the preliminary injunction hearing after the reply brief focused on claims three and four. We talked all about the prosecution history of Klein. And the district court simply ignored it. Simply ignored it. So we have the sites in the briefs where we talked to the court. We gave the sites to the prosecution history, et cetera. And it just doesn't show up in the district court. I don't understand why you did not bring up Klein in your opposition to the other side's motion for preliminary injunction. Because we felt it was redundant of Steinke, Ault, and Verbeek, as well as, and this is really important, Your Honor, I don't think it's redundant there. Well, they came back and created an artificial distinction that's nowhere in the patent that it matters whether it's an entry court or an exit court. And we threw Klein in there and said, look, this is clearly an entry court. This is a red herring. That's why I said it's a red herring. There's this distinction, entry versus exit, is just, we believe, made up. But if it matters, here's Klein that's plainly an entry court. So yet another example. I don't understand why you didn't raise Klein in your opposition brief when you raised all these other secondary references that had the slanted exit court, but what you needed was a slanted entry court to the capital. We don't need a slanted entry court. We just need a slant, Your Honor. That's the key. And that's the analysis the district court completely ignored. But Klein is, would you agree, a better reference than those secondary references that you actually cited in brief and had a big claim charted in your opposition to the preliminary injunction? No, Your Honor. For the simple reason that A819, we have Mr. Verba. So it's redundant, then, to the secondary references you did rely on? We believe so, yes. So then we don't have to look at Klein now because the district court didn't look at Klein. Correct. That's why I said it's a red herring. I think that the primary argument is one of single reference obviousness. You combine Adams with what was known to everyone of skill in the art, every device, every rapid exchange device. In the intervening 10 years between when our Adams patent issued and they filed for theirs, in that 10 years, the state of the art evolved. And device after device in the rapid exchange field had a skived entry. And that's what Mr. Verba says. Where do you have evidence of that? A819, we have Mr. Verba. The type of proximal site opening? I understand he says that. But all we have in the record in front of us today are the secondary references that you relied on in your opposition to the preliminary injunction motion. And they all have the skiving at the exit port, not the entry port. Your Honor, see, now you're falling into the same trap the district court did. What matters is whether the skiving's at the proximal port, the port closest to the operator. Whether you call it an entry or an exit port. And in secondary references, they're not at the proximal. No, they're all at the proximal. No, no, no, Your Honor. They're all at the proximal port. Every single one is at the proximal port. They got into this discussion of exit versus entry because in some cases, you what's called back load a guide wire. So you actually start at the distal end. And so they said it's an exit port, even though it's proximal, because the guide wire's coming from the left to the right. So that's a mistake the district court made. So are you saying then that the secondary references are showing skived entry ports? Yes, they're showing skived entry proximal ports. Where you are inserting some kind of cardiovascular tool inside that skived port? The guide wire goes both directions. I know, but the operator, the surgeon, the doctor, when he's inserting a tool inside the catheter, the skived catheter, in those secondary references, is that insertion going into that skived port? Your Honor, as a matter of the reference point of the doctor? Your Honor, as a matter of the cardiology, the only time you're typically inserting from the proximal direction is in the context of a guide exchange context. So all their argument really is saying you haven't shown that claims three and four are anticipated, because you haven't shown a guide catheter extension with a proximal skived entry port. And our response to that is, we've shown you that every other rapid exchange device has had a skived opening by the relative time. And so if you picked up Adams 10 years later, you would have skived it just like every other device in the doctor's table. So their argument is really just begging the question. All it's really saying is, you haven't proved there was a guide catheter extension with a skived entry port. And of course we haven't, because then it would be 102, not 103. OK, I want to move you on to something else real quick before I let you sit. The picture on page four of the reply brief, which has the Boston Scientific device, was a sample of that device included in the record below at any point in time? Yes. Would you please have it submitted to our clerk's office? Yes. Yes. OK, my last question is, as I look at this, the push rod portion seems to be the cylindrical portion in the middle of, almost like in the middle of, the long skinny rod looking thing. But it looks like about 2 3rds of the way from the end moving up, that it has assumed what looks like a slightly different shape. Is it a cylindrical rod with a hole in it all the way up until it gets to that little spouty looking thing? Or does it have a multitude of different shapes? There's the push rod, and then maybe up a little closer to the spouty looking thing. Is it a different shape? It looks like it is in the picture, the planetary. So it's one continuous type of tube that's the same dimension the whole way at its length. As I said, on the one end, you have the little tab that's screwed in. At the other, you pinch it, and then that is welded to what you described as the spout. OK. So that little spouty looking thing that connects to the blue part, right? That's what I'm talking about. Right. That is a different piece. OK. That little spouty thing, is it made of substantially rigid material also, though? It's part of the substantially rigid portion? Yes. Why isn't that the rail? Because that would be a piece by itself. I know it's not their argument. I get that. They don't get my argument on motion or on appeal. But why isn't that trying to figure out the rail, right? The patent describes an arcuate shape leading into a hemispherical shape. Those two pieces alone would perform exactly the functions the rail segment's supposed to perform, which is the present invention is, blah, blah, blah, utilizing a guide wire rail segment to permit delivery. That little portion there does exactly that. It permits delivery. It feeds. It offers a portion where it feeds into the lumen of the rest of the catheter. Your Honor, if that's the rail, I would note if you go to the upper right, the box, you see underneath the blue, where the blue first starts going from right to left, you see the cutout boxes? Yes. So that rigid portion continues to the left partway into the two? Yes. If Your Honor is correct that that's the rail portion, then that's a lumen there. That same piece has a complete tube, i.e. a lumen even under their definition. A lumen that extends inside, like fitting right inside of the blue part, right? Yes. Well, they argued and the district court seemed to believe that that collar, we'll call it a collar because I don't know what else to call it, wasn't part of the rail structure, right? That was the whole defining idea. They held that collar wasn't part. But making sure I understand the device, I don't know that this is right or not, but understanding the device, isn't the whole purpose in Boston Scientific's device of that curved, it may not be hemispherical, but it's at least arcuate, entry point into the blue part to allow the guide wire to go in? Isn't that the whole point of that part? It's a feeder. It's a feeder. Yes, correct. OK. All right. Thank you. You've been very helpful. Let's give him a chance. Does the court want to hear all? You've earned your money today. Thank you. Does the court want to hear at all about the lumen issue? Well, you're way out of time. I understand. I just. Charles. Let me ask at the outset, before the time starts, is there anything you would disagree with Mr. Wolff on, on sort of basic technology only, not precisely how patented or accused device works, but just process by which coaxial cables operate? He spent the first six minutes or so focusing on that. A little bit. I'd like to visit it, because it's very important to what the invention is, and it will help us understand both the devices and the. Yeah, but I don't want this to be in the context, because he didn't do it in the context of the infringement arguments or the invalidity arguments. I don't want to use, this is my time, not your time. You don't get to use my time. Understand. So the judge is asking for a generic picture. Yes. So let me just go through, I think the court has understood the steps. So we have needle stick, then we have guide wire through the needle stick, then the doctor uses a short introducer sheet just as an entry port, and then the doctor threads a guide catheter over the guide wire. But the doctor can't get all the way to where he wants to go with the guide catheter. It's important, what I didn't hear, to know that each guide catheter has a different shape at the end and is designed to be placed at the ostium, at the opening of the artery where you want to go. But that guide catheter device can't be pushed deeper into the artery where the lesion is. Into the branch artery. Into the branch artery where the lesion is on more difficult cases. And when you try your... Well, it can't on the difficult cases, but it can in some cases. It can never be pushed farther, but in some cases it can sit at that ostium because it's got that curve, and it's an easier case, and the guide wire can then push through deeper into the artery, into the curve and tortuosity of the artery, without pushing the guide catheter back out. But... Do you mean the guide wire, or do you mean a... Like a stent or what have you? First I'm talking... The guide wire is already... In there. In there. The guide wire is not all the way there, Your Honor. It's not all the way into the socket artery. It's only at the precipice of the artery? That's right. It's only after you get the guide catheter with that curve. And Mr. Root's Declaration of Connecticut 8200 explains all of this technology as best we could in detail with pictures and everything. Once you have the guide catheter with the bend at that opening of the artery, you still need to get that guide wire across the lesion. And sometimes you can't do it without dislodging the guide catheter. And that's where guide catheter extension comes in. This is a... That's the coaxial catheter that you've been talking about, is a guide extension catheter. Our product was the first one of its kind ever on the market. It revolutionized the industry. All right. Yep, yep, yep, yep. But... Generic. Generic. The way it works is it has three parts to it. The guide extension catheter has the flexible tip or flexible tube, which is 25 centimeters. Then it has a collar transition. And then it has the pushrod. And both devices have those three generic parts when we argue about the details later. And you thread that guide extension catheter over the guide wire that is inside the guide catheter. And then when you get to the ostium, because it's more flexible, it can make the turn. And you use the pushrod to make the turn and push that guide extension catheter, that more flexible piece, deeper into the artery without dislodging the guide catheter. So now we're in position to do cases that we could never do before because we have a guide extension catheter inside the guide catheter. Then after that, then Mr. Wolfe is correct, then you have to thread device and stents or balloons inside the guide extension catheter. And the guide extension catheter has some sort of a fluid seal to connect itself to the guide catheter. Is that correct? It does not. It does not. It is a five and six or six and seven. It is smaller than the guide catheter. It's a relatively tight fit, but it is not a fluid seal. So, figure nine of your patent, is that a fair representation of what we're supposed to be visualizing? Yes, yes, yes, sir. At age 60? I'm sorry? At age 60. At age 60. Well, figure nine, right? Figure nine. Yes, figure nine. Yes, yes, that's correct. And there are illustrations in color in Mr. Root's declaration starting at age 200. Now, given that. So let's start at time. The collar. Yes. The collar is simply the end of the guide catheter or is it the proximal end of the extension catheter? Where in all of this mechanism is there something called the collar? Where does it appear? The collar is the transition between the guide extension tube, the flexible tube, and the push rod. And the purpose of the collar is to transmit the force, to make the push rod push better, to advance that flexible tube, and also to have a transitional profile so that the stent can transition into that flexible tube without getting stuck or hung up. So it's really critical to the device. How does the push rod fasten? The push rod then is fastened to what we'll call the proximal end of the collar. Yes. Is that correct? Yes. How is it fastened in such a way that allows it to push, but you can still pass all these other mechanisms around it? How does that happen?  The push rod is a very narrow, thin piece that is. Flat. Flat and connected to the collar. That's right, Your Honor. Okay. Now, where in all of that mechanism is something called a rail structure? The rail structure comes from rapid exchange, which is another thing, and I understand it in my time, but this is tutorial land, I think. We didn't talk about that in Mr. Woolf's presentation. Mr. Root explains it. Railing is another word for rapid exchange. It's used to describe how we do rapid exchange catheter exchange. The old systems were over the wire, meaning the lumen ran the entire length of the catheter, and the whole catheter was threaded over a guide wire, whereas this guide extension catheter, our device and their device, has the flexible tube at the end, has a lumen, a short lumen, 25 centimeters, and that's threaded over the guide wire, and then the push rod is railed along beside. It describes the function of railing or pushing along beside the guide wire, so that now when the next device comes in, it's going over the guide wire next to the push rod. They're side by side in there. So railing and rapid exchange, it comes from monorail construction, and the Bonzeal patent is the pioneering patent in that. Art, Mr. Root explains it, but it talks about the difference between a monorail or a railing or rapid exchange. These are all synonyms, meaning using a short lumen over a guide wire, rather than a... Let me see if I understand you correctly. You're saying, I'm supposed to be picturing, inside the larger guide catheter, there's a coaxial guide catheter. Within the coaxial guide catheter is the guide wire, and at least for a portion of the coaxial guide catheter, there's the push rod that's going in through some section. I'll just call it the proximal section of the guide catheter, of the larger guide catheter. And you're telling me that the push rod and the guide wire are next to each other, in parallel. Yes. I can almost imagine the guide wire and then this very skinny, almost wire-like push rod running down longitudinally right next to each other. That's why it's called a rail structure? That's why it's called a rail structure? That's exactly right. Wait a minute, I'm railing against your use of the term railing. You're using railing as a verb or adverb. They use it here as a noun, rail structure. What is the rail structure? In the patent. Yes. It's the push rod. Where's our push rod in the patent? It's the push rod. So the patent talks about substantially rigid portion and then it talks about rail structure, as your honor points out, only once. But the patent, if you look. Column 10, line 40, talks about a rail structure without aluminum, am I in the wrong place? That's the claim. That's the claim. But the only place in the spec that talks about it is the random description of figure 17, which I didn't understand. Stay away from that for a minute. And then the summary of the invention, where it says, the present invention is a coaxial guide catheter that is deliverable through standard guide catheters by utilizing a guide wire rail segment to permit delivery without blocking use of the guide catheter. This was not the issue below, so it didn't get explored. But Mr. Root did explain, everybody in the art is going to know what monorail extension and monorail structures are. They're going to know that. It doesn't say much about it, but they're going to know that. And if you look at the figures in the patent, they pick up. Let me just explain what the figures in the patent are. Well, tell me about this function here. What is the function that the only discussion of rail segment in the entire spec has? Utilizing a guide wire rail segment to permit delivery without blocking. Delivery of what? Variance. I'm sorry, column 2, the first sentence under summary of the invention. Right. I have it on the line. We're talking about delivery of interventional cardiology devices, namely stents. OK. So it's going to, it's called a guide wire rail segment. So a portion of something that permits delivery. It's written there sounding like the rail segment is part of the guide wire, doesn't it? A guide wire rail segment, which makes no sense at all. Well, I actually thought what it meant was a rail segment for the guide wire or something. I don't know what it means. To permit delivery without blocking use of the guide catheter. It's going to permit the guide. See, I thought the rail segment has to permit the guide catheter. Is that not right? You're saying the whole purpose of the rail, if it is the push rod, is simply to line up next to the guide wire and not obstruct the stent. But that's not what it says here. It says to allow delivery of the guide catheter without blocking. It doesn't say that. That's not the stent. I learned enough today to know that's not the stent. And I thought the rail structure had a cutout portion, a hemicylindrical section of it that permits the inner tapered catheter to fit within it so it slides down like a track. And that would be a rail structure. So that's what the trial judge thought too, apparently. At least that's the way I read the trial judge's figure. That's how I read figures 12 through 15 as there's some kind of arcuate portion of your rigid portion. In column three, you have a discussion of your rigid portion, which could be stainless steel or a tube. And the rigid portion includes a cutout portion and then a full circumference portion, right? There are certainly embodiments in the patent that talk about the pushrod or the rail segment, the rigid portion segment being in these parts with a full circumference, hemicylindrical, and arcuate. There are embodiments like that. The claims are not limited to that, of course. It depends on what rail structure means, right? Well, I will tell you that when I read this patent, I really struggled trying to figure out what rail structure was. And the only thing I came up with that made any sense to me was the arcuate and hemicylindrical portions of what you described. That was the only thing that made any sense to me. You don't describe. There's no pushrod anywhere in here that I can tell. So I couldn't see how that could suddenly be the rail structure. So I understand your question, Judge Moore. You're saying the collar is the arcuate, is the rail structure, the collar. And I'm thinking that it's the tail. No, I thought it was the hemispherical and arcuate portion, which is not necessarily the collar, because I think the collar is the wholly round part that slides into the blue part. I think the lesson in all this is nobody should have a heart attack. That's a great lesson. No, but you, so I actually thought that the rail structure was the arcuate. And it made sense, right? Because I thought to myself, well, what is a rail? A rail is a thing that holds a railroad wheel, right? It's a groove, like a U-shaped groove, so the wheel fits in it and goes along. So I kind of convinced myself when I read this patent, you must be talking about the arcuate and hemicylindrical shaped portion of the whole big thing. Let me respond by making two points, if I could. First, I would like to recommend to the court to please look at Mr. Root's declaration, where he explains mono-railing, what railing is, and the Bonzio patent. Because that will help inform the background of the art. And this was not in dispute below. Boston Scientific didn't raise any of these points with us. Show me in some picture in this patent, what is the rail structure. So that was my second point. So the patent talks about the rigid portion, and doesn't use the rail structure very often. But we know that if you look at figure one, the rail structure. Figure one of the patent. Look at that figure one of the patent. And on top, we have that inner tapered catheter, the navigation catheter. We do not use that. That's not an accused device. That's not required by the claims that are issued here. That top drawing is not relevant to what we're talking about. The bottom drawing is a schematic of the invention, where on the right-hand side, it has the cylindrical flexible tube with aluminum. That part is threaded over the guide wire in rapid exchange technology. So you have a short lumen going over the guide wire. The rest of the device to the left, out to the handle, that's the rigid portion. And in this particular embodiment, that is the push rod or the rail segment. What part to the left, number 12? 12, the numbering isn't great. The 12 is the whole device. The 12 is the coaxial guide catheter. Right, 12 is the whole device. To the left of 20, but stopping back where you get to the handle, which is something different. In this particular drawing, in this particular embodiment, we have the push rod to the left, which is not, you know, it doesn't show the cylindrical opening. And then to the right, we have the flexible tube of the cylindrical opening. So you think 12 is the push rod? The numbering 12 is for the whole device. Or whatever, except from 20 left. Exactly. So you think that when you said substantially rigid portion, then that is the push rod. Right. And I just want to make sure the court understands that on figure four, there's another embodiment shown. And this is described in column six of the patent, what these different numbers mean. But there's a different embodiment shown where the, and it's just segmented. But to the left here, we have the flexible tube portion, the part that goes over the guide wire. Yeah, look at figure four. The area is denominated by the 42 and the 36. There's a cutaway, right? Right, this is the collar embodiment. This shows how. I assume that that was the rail structure. Because it ends up as a kind of a rail in the sense it's not a complete tube at that point. But you don't think that's the rail structure? No, it's everything to the right. It's that push rod that is used to rail. There's no push rod in this picture, right? It's to the right. It's assumed to the right. Well, the thing assumed to the right in the description of the figure is actually a second circumferential portion. When you're way to the right. Beyond that? No, the second circumferential portion in figure four, the way figure four is described is that it has a collar, which is part of the rigid portion. I'll read the description. Rigid portion 20 includes first full circumferential portion 34. OK, you're saying that's the flexible tubing, right? Yes. OK, then it says rigid portion 20 includes first full circumferential portion 34. Well, how is that part of the rigid portion if that's the flexible tube? Well, it's not, Your Honor. That's what they're saying. Poorly drawn, or wrongly labeled? The patent is telling us that we can have a flexible tube, and then we can have a rigid portion that has a collar, a full circumferential portion. And then that collar can taper to a push rod, which is not full circumferential, which is what the letter is. It says rigid portion 20 includes first full circumferential portion 34. So how I ought to conclude that means what? What did you say? That the patent covers and includes a device where you have off to the left a full circumferential flexible tube portion, and then you have a rigid portion, which is also full circumferential, which then goes down to the rail structure. I'm not great with patent drawings, but don't these little dashed lines that continue the entire length mean sort of the same thing? I mean, wouldn't you imply, kind of like the brake does, that there is some difference? If suddenly, if it was flexible right about at 18, and then suddenly at 34, it became rigid, wouldn't the drawing show some difference, generally? Is that the way the drawings work? They're supposed to, I suppose, Your Honor. All right, then I'll let you go on that for now. Let's go to the rigid. Just so I understand, your claim substantially rigid portion, as it's recited in the claim, in your mind encompasses not only the push rod, but it also encompasses what we'll call the collar, and also what we'll call the front proximal section of the tubular structure. Is that a fair assessment of what you think is the substantially rigid portion? Well, the issue before the court is whether a substantially rigid portion has to be limited to a rail without a lumen, or would the person of ordinary skill understand substantially rigid portion in those claims to allow for a rail structure without a lumen, and then another additional structure that has a lumen? And there's no question that the specimen. What's the answer to my question? Let me ask you the question again. OK, I'm sorry. You say in your claim a substantially rigid portion, and then there's a flexible tip portion. I'm trying to understand, when we're looking at these pictures, where to draw the line between the flexible tip portion and the substantially rigid portion. Am I correct that you believe that the substantially rigid portion is, one, the push rod, two, what we'll call the collar, which has this articulate portion and hemicylindrical portion and whatnot, and then three, at least a proximal section, maybe a small section, but a section nonetheless of the tubular structure. And then everything else is the flexible tip portion. I think that's right, Your Honor. That's all I wanted to know. Thank you. I apologize. I misunderstood. I want to be clear, though, that the claims of the patent cover both embodiments where the substantially rigid portion has can be a part of the device can be substantially rigid, be a collar, and can be a push rod. And they also cover other embodiments where the collar can be flexible. There's definitely both varieties. Can I take a minute or two and talk about the preliminary injunction? Sure. You were awarded a preliminary injunction, to my understanding. That's right. And you remember, if I remember correctly, there are four requirements for your preliminary injunction. The court found that you were more likely than not to prevail. I'll ask your competing counsel whether the question of ambiguity and indefiniteness of the basic patent was raised at the trial. Yes. Perhaps it wasn't. Anyway, he then did a rather quick and dirty treatment of the second and third requirements. But when we come to the public interest requirement, the trial judge said, although Boston presented evidence that at least one physician prefers the Guidzilla to the Guideliner, Boston has not shown that an injunction would endanger any patient or prevent any necessary procedure. Given the number of papers and physician testimonies provided by Vastu attesting to the success and efficacy of the Guideliner, the court is unconvinced that removing Guidzilla from the market would result in a loss of therapeutic options. That is, Vascular has adequately demonstrated that the public interest would not be deserved by an injunction. That's a very interesting characteristic of what the public interest requirement is. What's troubling me, counsel, is in order for you to get this injunction, you are dramatically changing the status quo. The status quo right now is competition between the two parties in this business, right? You're still selling your product, and they're selling theirs? No, Your Honor, and that's important. You're not still selling your product? We're still selling our product, but they're not still selling theirs. And the status quo. Because you have a PI, right? Because we have a PI. No, no, I'm talking without the PI, they would be selling theirs. Well, but we move for the PI immediately because of the production of the product. Counsel, listen to me. Don't give me an argument. Give me an answer. Without the PI, they would be selling their product. Is that correct? That's absolutely right. And you would be selling your product. That's right. And there would be competition in the marketplace. That's right. With the PI, your preliminary injunction essentially destroys competition in the marketplace because you two are the only players. And do I have that right? That's what the PI is for in this situation, yes. It's a classic case for a PI. Well, you think so. We do. The problem I'm having, and maybe you want to address it, is that the effect of your PI is to destroy competition as a matter of public interest. Now, it may be that that's the proper result in this case, but I'm troubled by it because ordinarily a preliminary injunction ought not to make that big a change in the marketplace without some compelling public interest. The trial judge's version of the public interest was it would not be deserved by an injunction, which is hardly a statement of the public interest. How do you explain the validity of your PI in the light of the fact that it now ends any competition in the marketplace for an indefinite period of time? Well, until trial, obviously. Which could be a trial and then appeals, all of which we all know take years in this business. Sure. Well, that was the marketplace until the infringement began for several years. There's no question that Vastus Solutions can supply the marketplace. There is no clamor. The only showing that was made by Boston Scientific, the only evidentiary showing on public interest, and the only argument that was made, was that one doctor preferred the device. And that's just not enough, given the situation where we have to look at all the equities. That's an abuse of discretion situation, but the judge's got to look at all the equities. And we've got a brand new market that we created that's critical to our company. And we've got the $7 billion behemoth who can wipe us out in that brand new market that we created. That's what patents are for, to protect the innovation that we made to change cardiovascular surgery. Yeah, but you've got the burden of proving a preliminary injunction. It is a form of exceptional remedy. And I don't know, but I certainly have probably demonstrated to you that I had more than just a little bit of difficulty understanding the claim terms at issue, and trying to figure out whether there is a legitimate argument about infringement. I don't know, I mean, you're telling me what a skill in the art would know what a rail structure is. I promise you judge more. I don't get that from anything in your record at all at this point in time. Maybe three judges here were completely convinced it was only the arcuate and hemispherical, which by the way, would have helped you if it was, in terms of your infringement argument against them. But you're saying absolutely that's not the case. So given how befuddled we are based on the state of the record, does that really justify a PI in this case? Oh, I think so, Your Honor. But likely the success factor that you're grappling with is infringement. And the arguments that were made below is that the opponent can change the product by putting this hair breath with fake lumen, they can call it that, it's not a true lumen, inside the hypotube. And so it all turned on, what does a lumen mean? I think your bigger problem is validity, not infringement. Validity in respect to Adams and Stanky Alt and Verbeek? Because I haven't addressed that. How would you respond to this? The Supreme Court made clear long ago that, quote, the equities of the licensor do not weigh very heavily when, that's the patentee in this case, do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. That's Leader Lee Adkins in the Supreme Court in 1969. I'm troubled by whether we've got a problem. Maybe we don't. Help me understand if we don't. Well, we don't, Your Honor, because this is what patents are for. We've got patent claims that cover the pushrod, collar, flexible tube embodiment that they have copied identically. And you may eventually win. Those dependent claims. You may eventually win, but that's what the trial is for, isn't it? Well, but when you can show irreparable harm, which we did, and it really wasn't contested below, and it's contested here only on a technicality, wasn't contested at all below, when you've got irreparable harm, that's what patents are for. That's what preliminary injunctions are for. And we understand the law to be that if we've got a patent, and it's our flagship product, and it's 20% of our sales, and we're going to lose salesmen, we're going to lose sales force, we're going to lose market share, we're going to have incalculable harm, which we showed. When we're entitled to the PI, we can show a level of success. And I'd like to address the validity point. I know that I'm well over time, but we haven't talked about that. One minute. OK, one minute. They didn't even make a threshold showing of validity. They didn't raise a substantial question, because they do not show anywhere in the prior art of the proximal side opening adapted to receive devices while inside the die-cast. Are you considering Klein as part of the prior art, or you say it's not? Klein is not part of the record. It can't be considered. But Klein doesn't show it either, and we explain that in our brief. But we're just lawyers talking. So it's pretty hard for either side to make any statements about Klein. But Altsteinke and Verbeek do not show the element. So they don't get the first base on validity. They don't even get the first base on validity. The examiner cited Klein in rejecting claims three and four during the application, right? In combination with another patent, but didn't say anything about the issue that we're confronting today. And we didn't acquiesce. There was back and forth arguing about circular, non-circular, if Your Honor will remember. But the claims were then granted without any, there's no finding in there by the examiner that Klein discloses a proximal side opening adapted to receive devices while inside the die-caster. And it does not do so. It does not do so. Your position was all the secondary references actually cited and relied upon below were about exit ports, not entry ports, right? There's no question that there is. Is that right? And then Klein as an entry port? Klein has planted, skived. Klein does not have an entry port that's used inside the die-caster. I don't know what makes you and Mr. Wolf dancing all around my podium. Stay behind the podium. Yes, Your Honor. Move yourself. Yes, Your Honor. Sorry, Your Honor. Don't move. That's right. And the other thing about Klein, Your Honor, is Klein is really different because the entry part of Klein is perpendicular. When it pulls that balloon catheter back in, as we described in our papers, it doesn't use the skive. It uses a soft, flexible, perpendicular opening. So it doesn't teach this. All right. I think we need to give Mr. Wolf his rebuttal time and then call it a day. We've definitely gotten a lot of useful information out of this so far. So Mr. Wolf, why don't you come up? I'm going to give you two minutes of rebuttal time at this point because I don't know how much more you're going to add, but go ahead and give it a shot. Three points, Your Honors, and then I will sit down in the two minutes. The first, counsel gave up the ghost on the obviousness argument when he listed all of the things that the prior art didn't have, when, in fact, Adams had all of it but one thing, a skived opening. Mr. Verba said that it was one of skill in the art that would have been in their toolkit. In fact, it would have been the norm. We gave examples under Skinner Tech and KSR. That is the axiomatic way you show obviousness. All he really said in the last few minutes was the claims three and four weren't anticipated, which we can see. Adams gives you everything but a cut. The cut was the norm. It was the toolkit. It's the way someone would have done it, and that was undisputed below. All they said is, well, our collar was unique. I urge you to look at the claims. The claims don't talk to the collar, all of the different nuanced features. They talk to the geometry of the cut. But maybe their secondary consideration arguments are strong. Why don't you move on to the issues that we spent most of the night or day on? Yes. To your question, Judge Chen, about what is the lumen, what is the substantially rigid portion, under their definition of substantially rigid portion, there's not one but two lumens. The district court even conceded that the ordinary meaning of lumen captured what we were calling a lumen. On this record, they didn't have a way to veer from it. Your Honor, you asked about what was the substantially rigid portion of the rail section. The reason they didn't embrace that at the rail section is because the prior art would have killed it dead. They needed to try to get that three-part answer that was given to Judge Chen's question about what's the substantially rigid portion in order to give them to have a fighting chance on validity. So they made an argument that's utterly unsupported by the patent. That's a fight we're having now. Final point on the public interest. I believe the district court dismissed improperly what we argued. We had a single doctor who came forward with a declaration saying there are lots of advantages of our product. That wasn't a doctor saying only I believe this. It was one declarant saying there are lots of advantages to our product, advantages that are lost to the public as we sit here today. Question. On the lumen point, to the extent that the examiner added the non-lumen, without a lumen language, and they acquiesced in it, why isn't it the only kind of lumen I'm familiar with in these coaxial catheter cases, which is the tunnel, not the entirely closed cavity? I mean, all of the dictionaries that you submitted talk about the tunnel in terms of arteries and vessels and catheters. And they talk about a cavity only in the context of a cell, a fully enclosed cell. And that's like a whole different art than the coaxial cable art. So why isn't the definition, the plain and ordinary definition, forget disclaimer or anything, the passageway in the context of this art? Your Honor, the discussion of solar in the file wrapper puts this entire issue to bed. Solar had exactly the hypo tube we're talking about. There's nothing in solar that says anything could go through it. In contrast, it were device. If their definition of solar clearly closed off, is it clearly a cavity, as opposed to you just don't know? Well, remember, the definition used was to which extent a catheter or contrast media could go. So the definition applied by the district court was not about whether it was closed again. And the housed opinion in this court clearly said that. That was from 1970. And it was a different time period. You've got to figure out what it means to someone of this art at the relevant time. The district court acknowledged that at the relevant time, that the closed-unclosed, that that was a distinction that Luhmann didn't inherently imply. The district court expressly said in its opinion, I agree with Faust and Scientific as to the ordinary meaning of Luhmann to want to steal in the art at the relative time. But I find that we're going to derogate from that meaning in light of what the patent says. But the solar discussion in the file wrapper shows that can't be right. And just as importantly, in claim one, the phrase continuous Luhmann is used. If Luhmann already implied continuous, why did you need the word continuous? There are two different kinds of Luhmann. You're reading continuous as open. Yes, that can go from one end to the other. There are two different kinds of Luhmanns in play here. You need a big Luhmann at the end so you can stick the stent through. But that wasn't what the question of rail structure without a Luhmann was about. That was talking about very small pushrods like in solar. And so we're mixing apples and oranges. The district court says, well, Luhmann always meant open through which a lot of things could go through. That's the Luhmann at the distal end. The examiner was worried about whether there was a Luhmann at the proximal end like in solar. And if Luhmann means continuous, that contrast media and stents have to be able to go through it, as the district court said. These claims never would have issued over solar. Thank you. Thanks, both counsel and the court. We'll resume in a minute. Thank you, Your Honor.